## Anson E. Chadwick and others v. Sally M. Broadwell and others.

*Contract for manufacturing lumber: Lien for saw bill: Credit.* The contract in this case for manufacturing lumber from logs was held to give a lien for the saw bill, notwithstanding a provision for the payment of the bill for sawing "as often as once a month after the lumber is delivered out of said mill." CAMPBELL, J. dissenting.

*Lumber: Saw bill: Lien: Removal: Inspection: Possession.* This lien was not lost by the removal of the lumber from the mill yard, some five miles, to a dock at the place of shipment; the provision of the contract that the quantity sawed should be determined by the sales or inspection bills at the place of shipment, is not inconsistent with the continuance of such lien; and such inchoate and conditional possession as might be taken by the purchaser as inspection proceeded would not cut off the lien.

*Logs: Lumber: Lien for sawing: Bona fide purchaser.* Parties who, in contracting for the sale of logs, have provided for the manufacture of the logs into lumber by their vendee, and thus permitted him to create a lien thereon for the sawing, in dealing with his assignees afterwards in respect to the lumber without any inquiries as to such lien, cannot claim the rights of *bona fide* purchasers through a mere formal transfer by word of mouth simply, and in consideration of a pre-existing debt for the purchase price of the logs.

*Replevin: Saw bill: Lien: Measure of damages.* Where the defendants in a replevin suit have established a lien for sawing, upon a quantity of lumber of which that replevied was only a portion, a ruling which permits the assessment of their damages at such a portion of their whole lien as the lumber replevied bore to the whole amount subject to the lien, is not one of which the plaintiffs can complain; such apportionment is even more liberal to the plaintiffs than the law requires.

*Heard January 11.    Decided April 15.*

Error to Alpena Circuit.

*A. E. Chadwick,* in person, for plaintiffs in error.

*McDonell & Cobb,* for defendants in error.

CHADWICK v. BROADWELL.

COOLEY, J.

The facts out of which the present controversy arises are in the main undisputed. On the 31st day of August, 1868, Anson E. Chadwick and Thomas S. Skinner, two of the four plaintiffs, as parties of the first part, entered into a written agreement with Charles Clewley, as party of the second part, by which (quoting from the contract), they "agree to sell to the said party of the second part all the merchantable white pine stumpage" on certain described land, "for the sum of three dollars per thousand feet, to be paid for as hereinafter stated. And the said party of the second part covenants and agrees to and with the said parties of the first part, that he will cut and put into the river during the coming winter, all the good merchantable white pine which will make good merchantable lumber; * * that he will keep a just and accurate scale of said logs, which shall always be open to inspection of the parties of the first part or their agent, and that he will pay to the said parties of the first part the just and full sum of three dollars per thousand feet on the first day of July next; that in case the parties of the first part shall feel aggrieved at the manner of cutting said pine, they may take disinterested judges of pine, and estimate what pine, if any, is wasted or left on the premises, and the logs cut and put in as aforesaid, and the lumber manufactured from the same shall be held as well for what is left on the premises as for that which is put in as aforesaid."

Chadwick and Skinner, it appears, were interested in the land on which the logs were to be cut, jointly with Calvin Ames and Lucius B. Wheeler, the other plaintiffs; and there was evidence from which the jury might conclude that the contract was executed by the parties of the first part thereto on behalf of all concerned, and that Ames and Wheeler afterwards practically adopted it and claimed rights jointly with Chadwick and Skinner under it. Clewley went on to cut the pine under the contract, and caused the logs to

be rafted to the mill of defendant Sally M. Broadwell, to be manufactured into lumber. At some time before April 8, 1869, Clewley appears to have transferred to George S. Lester and Fulton Bundy his interest under the contract in these logs, and they made with Mrs. Broadwell, as party of the second part, a written agreement of that date by which they "agree to deliver into the boom of said Broadwell as soon as they can be run, about two million feet of saw logs, more or less; and it is hereby understood that the expenses incurred in sorting the logs into said boom shall be paid by said second party. The said party of the second part agrees to take said logs and manufacture them into lumber, in a good workmanlike manner, with economy and prudence, and under the direction of the parties of the first part, as regards the kind of lumber to be made, one half of said lumber into strips if the parties of the first part may require it, and to take care to make all the upper qualities that is possible, and to assort and keep the upper qualities separate from the common; and for all of which the said second party shall receive the sum of four dollars and fifty cents per thousand feet; and it is understood that said four dollars and fifty cents includes all railroad charges. The quantity of the lumber is to be determined by the sales or inspection bills at the place of shipment. It is understood and agreed by the parties to this contract, that the party of the second part is to commence sawing said mentioned logs as soon as they are delivered as above specified, and to continue to saw on said saw-logs as fast as the capacity of said mill will permit; and to run night and day until they are all manufactured into lumber; and the parties of the first part agree to pay to the party of the second part, the amount of said bill as often as once a month after the lumber is delivered out of said mill."

The stumpage was not paid according to the contract made with Chadwick and Skinner, and there was owing therefor in the winter of 1870 some three thousand eight hundred or three thousand nine hundred dollars. Neither was the bill

for sawing paid; and there was owing upon that three thousand two hundred dollars. The lumber as it was cut was put upon cars and taken from the mill to the Trowbridge dock, five miles distant, over a track, some sixty rods of which belonged to Mrs. Broadwell, and the remainder to Trowbridge. The railroad charges were one dollar per thousand feet, which either wholly or in part were paid by Lester and Bundy and charged to Mrs. Broadwell. The track ran into the mill yard, and there was testimony to the effect that the only means by which the lumber sawed could be carried from the mill in order to keep the mill clear, was the taking it off as was done. Both Mrs. Broadwell and her husband testified that they complained of the non-payment of the saw bill, and that it was agreed between them and Lester and Bundy that this removal of the lumber should not deprive her of a lien,—as Mr. Broadwell says, "that the lumber should be held on the dock, and the lien should continue on the dock, and that the lumber should not be shipped until we were paid or had satisfactory drafts for the saw bill;" or as Mrs. Broadwell says: "He (Bundy) told me I should have the lumber until the saw bill was paid. He said it would made no difference about the lumber being on the dock or in the yard;" or as Bundy says: "Mr. Lester and I consented that defendants' lien should continue on the dock the same as before." This was in July or August, 1869, and though not otherwise important, tends to show that any lien the law would give was not designed to be waived.

In the winter following this arrangement, Lester and Bundy, as plaintiffs claim, turned out to Ames and Wheeler for them about four hundred thousand feet of the lumber on the dock in payment of the balance due for stumpage. Bundy says: "I made a formal delivery to Ames and Wheeler on the dock." This delivery, however, it is evident was merely nominal, as the piles were in no way disturbed. In May, 1870, Chadwick, on behalf of the plaintiffs, went up with a scow to take away the lumber thus

27 MICH.—2.

turned out, but found Broadwell there, who refused to permit it, claiming to have a lien for the saw bill. Chadwick testifies: "I told Broadwell in May or June, 1869, we owned the logs and should hold them under lien or conditional sale. Think none were sawed then. In October, 1869, I told him I had stopped any further shipment of lumber; lumber all sawed at this time, I think." "In the fall (of 1869) I advised him to proceed under the statute to secure or collect his saw bill out of the lumber."

Broadwell having thus refused to permit Chadwick to take away the lumber, the plaintiffs brought replevin. In the circuit court verdict and judgment have been rendered against them and the case is now before us on writ of error.

Numerous exceptions were taken to the rulings of the circuit court, but those relied upon here present but few points. That court held that Mrs. Broadwell, under the contract, had a lien on the lumber sawed for the saw bill. Plaintiffs, on the other hand, insist that the contract is inconsistent with an intent to retain such a lien. The reason they assign for this conclusion is, that by the contract the quantity sawed is "to be determined by the sales or inspection bills at the place of shipment," "which means that there was to have been no other measurement or place of measurement than the shipping measurement; and this measurement was the act of delivering to purchasers on board their vessels. The lien claimed would have been a fraud on purchasers."

We do not very clearly perceive that the determination of quantity by the inspection bills when sales were made would be inconsistent with the continued existence of the lien until payment was made. On the contrary, there would seem to be some good reasons for fixing upon this time and place for the purpose, even though it were understood that the lien was to be satisfied before the purchaser should acquire title. It would obviate the necessity which, in case of a purchase, would otherwise exist for two inspec-

tions,—one to determine the sum to be paid for sawing, the other to ascertain the quantity delivered to a purchaser. But whether one inspection or two were had would be immaterial as regards the right of the mill man to payment for his work, or of the owner to the consideration to be paid on a sale. The inspection alone would not cut off the lien of the one, or the title of the other; neither would such possession as might be taken by the purchaser as inspection proceeded, have that effect, in the absence of any explicit understanding on the subject. Any such possession must be regarded as inchoate and conditional until payment should be made, and as only one of several steps in a transaction which the payment would complete. It is true that if the mill-man should stand by and allow the lumber to be sold, delivered, and paid for without asserting his lien, he might be estopped from asserting it afterwards; but this contract evidently contemplates a transaction to which there are or may be three parties, and if all participate, the purchaser is necessarily apprised of the lien, and is not wronged by its being insisted upon.

The provision in the contract that, the amount of the bill for sawing shall be paid "as often as once a month after the lumber is delivered out of said mill," is not inconsistent with this view. We think whenever a sale was made, the defendant would be entitled to payment for sawing that amount, before the lumber could be taken from her possession; but she was entitled to monthly payments on inspections to be made at the place of shipment, whether sales were actually made or not.

We also think the circuit judge was right in holding that Mrs. Broadwell did not lose her lien by suffering the lumber to be placed on the Trowbridge dock. Under the agreement between Lester and Bundy and herself, the possession remained in her as much after it was transported to the dock as it did before. If she allowed sales and deliveries to be made to purchasers who were ignorant of her rights, the lien would thereby be waived to the extent of such sales, but not further.

But the plaintiffs claim that they were *bona fide* purchasers, and as such were put in possession before they knew of any claim of lien. To this it may be replied that the whole transaction as between them and Lester and Bundy was by word of mouth only; no actual possession was taken by plaintiffs, and the attempt at a formal transfer of possession was ineffectual, because not made by the party in whom the possession vested. Mrs. Broadwell, in respect to the transaction, has been guilty of neither fraud, deception or negligence; the plaintiffs have paid nothing in consequence of it; and if their purchase fails by reason of her insisting upon her legal rights, their debt against Lester and Bundy remains as before. And in this view we think it immaterial whether or not the plaintiffs at the time they agreed to take the lumber in satisfaction of their claim had actual notice that Mrs. Broadwell insisted upon a lien, as defendants claim it is proved by Chadwick's testimony that they did. The nature of their own contract with Clewley was such as to permit him to have the logs manufactured, and consequently to create a lien thereon for the labor; and if they dealt with his assignees afterwards in respect to the lumber, they were bound at their peril to ascertain, either that the lien had been satisfied or waived, or, on the other hand, that the assignees had such possession of the lumber as to warrant the inference that no lien then existed.

The plaintiffs also object to the rule of damages laid down by the circuit judge for the guidance of the jury. The lumber replevied, it appears, was only a portion of that which remained upon the dock, and upon which Mrs. Broadwell retained a lien. The judge instructed the jury if they found in favor of defendants to assess Mrs. Broadwell's damages at such proportion of the whole amount of her lien as the lumber replevied bore to the whole amount in her hands subject to the lien when the writ issued. This was done; but the plaintiffs claim that there was included in this an amount of railroad charges which had been paid by Lester and Bundy. Assuming

this to be true, we think no error was committed to the injury of the plaintiffs. The verdict rendered is not claimed to be more than is due Mrs. Broadwell after all proper deductions are made; and as all the lumber was subject to the lien for all that was due on the sawing bills, the judgment cannot be excessive. She had a right to demand payment of the whole before any of the lumber should be taken from her, and the judge erred in favor of the plaintiffs when he made an apportionment to which they had no claim.—*Partridge v. Dartmouth College, 5 N. H., 286.*

It follows from these views that the judgment must be affirmed, with costs.

GRAVES, J., and CHRISTIANCY, Ch. J., concurred.

CAMPBELL, J.

I am inclined to think that, whatever may have been the superiority of plaintiffs' lien under the original contract, over any lien that might be created by their vendees, they lost all right to contest any encumbrance made by the latter, when they purchased a specific parcel of the lumber. By such purchase they could obtain no better title than was held by those from whom they purchased, except on the same conditions which would apply to any other persons making a similar purchase. There can be no doubt of the right of any person to transfer or encumber such title as he has.

But I do not think the contract with defendants is consistent with such a lien. The lumber was to be sawed during the shipping season, if the capacity of the mill should permit. The inspection was not expected to be made except in preparation for shipments, and it was not contemplated that the lumber should remain a month, or any time at all, beyond what might be required for removal. Under these circumstances a stipulation that payments

should be made "as often as once a month after the lumber is delivered out of said mill" would not justify a demand for any payment at shorter intervals, and could not, I think, be made consistent with the existence of any lien, unless the lumber was required to be kept that long before shipment. No one can draw this inference from the contract. On the contrary, the shipping inspection was the only means whereby it could be ascertained what had been so delivered. The sawyers were to assort and keep the grades and kinds of lumber separate. The mill culls were, by the express terms of the contract, to be "estimated at the mill." The rest could only be estimated by inspection on the dock, and it is evident it was to be taken there as fast as sawed, and to be shipped as soon as the owners chose. They could, if they chose, transport it elsewhere themselves. They were not bound to make their sales at that place. Cargoes might and would naturally be shipped immediately after manufacture, and before a small fraction of the month's credit had run out. A construction which requires payment to be made at once upon inspection seems to me to render the whole credit clause nugatory. The fact that the parties all regarded the contract as creating no lien is not sufficient to destroy one if it existed; but it shows at least that such a construction is a natural one. The parties must have calculated on raising money from sales of lumber, or there would have been no obvious reason for desiring any credit; and they must have contemplated making sales as other men make them, in such markets as should be most acceptable. It is not, I think, consistent with this contract, to confine them to cash sales at the dock, or to compel purchasers to take subject to a lien, and to run risks in regard to it.

I think the judgment should be reversed.